UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
OMAR ABDELHADI,

                Plaintiff,

  -against-                        **MEMORANDUM AND ORDER**
                                             Case No. 08-CV-380
THE CITY OF NEW YORK, NEW YORK
CITY DEPARTMENT OF CORRECTION,
and MARTIN F. HORN, Commissioner,
New York City Department of Correction,

                Defendants.
-------------------------------------------------------x

*Appearances*:
*For the Plaintiff*:                          *For the Defendants*:
ALAN SERRINS, ESQ.              MICHAEL A. CARDOZO, ESQ.
Serrins & Associates, LLC        Corporation Counsel of the City of New York
233 Broadway, Suite 1800         By:    KATHLEEN M. COMFREY, ESQ
New York, New York 10279             100 Church Street
                                                      New York, New York 10007

**BLOCK, Senior District Judge:**

        Omar Abdelhadi, an observant Muslim of Middle Eastern descent, sues the City of New York and the former head of its Department of Correction ("DOC"), Martin F. Horn.[1] Proceeding under Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), he alleges that he was subjected to ethnic and religious discrimination during his employment with DOC. Proceeding under 42 U.S.C. § 1983, he further alleges that he was deprived of his rights under the First and Fourteenth Amendments.

---

       [1]Abdelhadi has also sued DOC itself. Since, however, DOC is a non-suable agency of the City, it must be dismissed as a defendant. *See Echevarria v. Department of Corr. Servs.*, 48 F. Supp. 2d 388, 391 (S.D.N.Y. 1999).

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court held oral argument on March 16, 2011, and has considered the parties' pre- and post-argument submissions. For the following reasons, the motion is granted.

## I

Unless otherwise noted, the following facts are undisputed or, if disputed, presented in the light most favorable to Abdelhadi. *See Federal Ins. Co. v. American Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

### A. Abdelhadi's Employment History

Abdelhadi began training at the DOC academy in June 2005. He immediately requested religious accommodations, asking to be excused from working a night shift every other Friday "for Islamic prayer observation," and for permission to "carry a lite beard for Islamic beliefs." Defs.' Rule 56.1 Statement ¶¶ 8-10. DOC granted these requests, as well as Abdelhadi's periodic requests for time off for religious observances.

Abdelhadi's training came with probationary employment as a DOC officer. He was qualified to use firearms for certain job functions and, with DOC's permission, purchased a personal firearm for on- and off-duty use.

### B. NYPD's Allegations

Later in 2005, two New York Police Department ("NYPD") officers informed Horn that Abdelhadi was a subject in an ongoing counterterrorism investigation. The officers told Horn that the plaintiff had, in the presence of undercover officer Kamil Pasha,[2]

---

[2]"Kamil Pasha" is an alias.

made comments about wanting to engage in jihad. According to the officers, Pasha had heard the statements while attending meetings at the Islamic Society of Bay Ridge. The officers did not provide Horn with details at that time, and there is no evidence that Horn took any immediate action.

In January 2007, the NYPD officers gave Horn a memorandum detailing specific statements attributed to Abdelhadi between February 11, 2004, and June 2, 2005:

- "[W]e are going to hit America and they won't even know it."
- "[W]e must learn how to shoot because when jihad breaks between the kufars [infidels] and Muslims in America, we must be ready."[3]

Defs.' Rule 56.1 Statement ¶ 44. The memorandum further alleged the Abdelhadi made comments that "he does not care about the Corrections department, and that all he wants is guns." *Id.*

The statements listed in the memo were drawn from conversations recorded on audiotape in the course of NYPD's investigation. Following oral argument, the Court directed Abdelhadi's counsel to review the tapes and submit any excerpts relevant to his claims. Having done so, counsel has not argued that the memorandum reported any statements that were not on the tapes, or inaccurately described those that were. Nor does Abdelhadi dispute that Horn read the memorandum.

---

[3]For present purposes, the Court accepts Abdelhadi's deposition testimony that "the Jihad that was referred in the conversation that I had with Mr. Pasha was a — a struggle, not a war[.] Jihad and the meaning of Jihad is a struggle, not war." Abdelhadi Dep. 21.

## C. DOC's Response

Horn ordered a confidential internal investigation in order to "reassure [DOC] as an agency that it could rely on [the statements in the January 2007 memorandum]." *Id.* ¶ 48. Horn and other DOC officials met with Pasha, who confirmed that the memorandum accurately conveyed what he had heard Abdelhadi say. At his deposition, Horn stated that he did not listen to the underlying tape recordings based, in part, on Pasha's reassurance.

At the conclusion of the investigation, Richard White—DOC's Deputy Commissioner for Investigations and Trials—prepared a confidential memorandum recommending Abdelhadi's termination. White reasoned that Abdelhadi had "obtained a firearm under what appeared to be less than credible motives. It was not for self-protection, but the advancement of violence against individuals." White Dep. 148. He continued:

> [Abdelhadi] had specifically indicated that he wanted to join the [DOC], not for care, custody, and control, but to obtain a firearm. He then went through the efforts of obtaining a firearm at one of the earliest points possible, which was then consistent with what [DOC] had learned from the undercover as to what his true motives were.

*Id.* Although White's memorandum focused on Abdelhadi's statements to Pasha, it noted that his "attendance issue" also justified termination. *Id.* at 49.

At around the same time, DOC's General Counsel, Florence Hutner, told Horn "that termination of [Abdelhadi] was warranted by the information that [DOC] had." Hutner Dep. 22. She concluded that "some of the statements [Abdelhadi] made indicate

4

that there may be a serious level of danger, whether to persons within the custody or the employ of the department or in the general public, and that these are not appropriate bases for someone to be a correction officer." *Id.* at 22-23. Like White, she also noted that "the level of absences in [Abdelahdi's] first . . . year-and-a-half as a probationary correction officer were in the range that were problematic, at least." *Id.* at 23.

Horn decided to terminate Abdelhadi. On March 20, 2007, Abdelhadi was presented with a termination letter. When he refused to sign it, a DOC official leapt out of his chair and said, "If you want to play hardball with me, we could play hardball, but I'm trying to be nice to you, so sign the document." Abdelhadi Dep. 149. It is unclear whether Abdelhadi eventually signed the letter, but there is no dispute that the termination was effective with or without his signature. Pursuant to DOC regulations, Abdelhadi was required to surrender his personal firearm. At no point was he given a reason for his termination.

### D. Abdelhadi's Proffered Comparators

Michael-Paul Sherman is neither Muslim nor of Middle Eastern descent. He began serving as a probationary DOC officer on the same day as Abdelhadi.

In May 2007, White recommended Sherman's termination due to a recent arrest for third-degree assault and second-degree reckless endangerment. According to a report prepared for Horn, the charges stemmed from an incident in which Sherman grabbed a female passenger out of a car and threw her to the ground, causing lacerations and bruising.

5

Sherman's employment was extended on a day-to-day basis pending the resolution of the criminal case. Horn accepted White's recommendation upon learning that Sherman had pleaded guilty to second-degree harassment. Sherman resigned before his termination took effect.

Edna Miranda is neither Muslim nor of Middle Eastern descent. She, too, served alongside Abdelhadi as a probationary DOC officer.

Miranda was terminated after accumulating approximately 158 absences on account of purported illnesses. Abdelhadi, by comparison, missed about 30 days of work due to illness or injury.

## II

**A. Discrimination Claims**

Abdelhadi's Title VII, NYSHRL and NYCHRL claims are all analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000) ("Our consideration of claims brought under the state and city human rights laws parallels the analysis used in Title VII claims."). The Second Circuit has described that framework as follows:

> [T]he plaintiff bears the initial burden of establishing a prima facie case of discrimination. . . . If the plaintiff does so, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action . . . . If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination.

*Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008) (citations and internal quotation marks omitted).

To make out a prima facie case of discrimination, the plaintiff must show (1) that he belonged to a protected class; (2) that he was qualified for the position; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). Abdelhadi's ability to state a prima facie case turns—as it does in so many cases—on the fourth element. In that regard, he argues, first, that he was treated differently from Sherman and Miranda and, second, that he was a victim of racial profiling by the NYPD, for which the City is liable under a "cat's paw" theory.

### 1. *Disparate Treatment*

Abdelhadi first relies on the well-established principle that "[a] showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' —is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). To allow the Court to draw meaningful comparisons, however, he must show than he and his proffered comparators were "similarly situated in all material respects." *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997).

With respect to Sherman, it is not apparent what the disparate treatment was, since both he and Abdelhadi were terminated (although Sherman chose to resign before

the termination took effect). As best the Court can glean, Abdelhadi takes issue with Horn's decision to wait for Sherman to plead guilty before terminating him. In the Court's opinion, this is insufficiently different to give rise to an inference of discrimination. It was not possible to treat Abdelhadi in precisely the same manner because he was not charged with a crime. How Horn handled an employee charged with a crime sheds no light on how he handled an employee allegedly engaged in conduct that was not criminal, but still warranted termination.

For essentially the same reason, Abdelhadi is not similarly situated to Miranda. The only inference to be drawn from Miranda's termination is that DOC considered 150 absences an extremely serious problem. It does not follow that fewer absences would not, in DOC's view, also justify termination.

## 2. *Cat's Paw Liability*

Perhaps recognizing the weaknesses of his attempted comparisons to Sherman and Miranda, Abdelhadi stressed his second theory of liability at oral argument. According to that theory, he was the victim of ethnic and/or religious profiling by the Pasha and the other NYPD officers conducting the antiterrorism investigation. He asserts that those officers were driven by discriminatory animus to make false allegations against him to DOC, and that Horn, in turn, relied on the allegations in deciding to terminate him.

This theory relies on "cat's paw liability."[4] Without it, the Court's sole focus would be on the motivation of the decisionmaker, Horn. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) ("Nor can statements by

---

[4] So called based on the LaFontaine fable, "Le Singe et le Chat," in which a monkey persuades a cat to retrieve hot chestnuts from the fire for him.

8

nondecisionmakers . . . suffice to satisfy the plaintiff's burden [of raising an inference of discrimination]."); *see also McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("[W]e are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what motivated the employer." (citation, internal quotation marks and alteration omitted)).

The Supreme Court recently upheld the use of cat's paw liability in discrimination cases in *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011).[5] Applying general principles of agency law, it concluded that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 1194. It rejected a stricter view adopted by some circuit courts that cat's paw liability is not available if the ultimate decisionmaker exercises independent judgment. *See id.* at 1190 ("[U]nder Seventh Circuit precedent, a 'cat's paw' case could not succeed unless the nondecisionmaker exercised such 'singular influence' over the decisionmaker that the decision to terminate was the product of 'blind reliance.'" (quoting *Staub v. Proctor Hosp.,* 560 F.3d 647, 659 (7th Cir. 2009)).

Several limiting principles are built into the Supreme Court's holding. First and foremost, the supervisor must intend his or her acts to cause the adverse employment action. *See id.* at 1194 n.3 ("Under traditional tort law, 'intent' denotes that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially

---

[5]*Staub* involved anti-miliary discrimination, which is prohibited by the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). Apart from the type of discrimination proscribed, there is no meaningful difference between that statute and Title VII.

9

certain to result from it." (citation, internal quotations marks and alterations omitted)). Second, the biased individual must be a supervisor of the plaintiff. *See id.* at 1194 n.4 ("We express no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision."). Third, "the employer would be liable only when the supervisor acts within the scope of his employment, or when the supervisor acts outside the scope of his employment and liability would be imputed to the employer under traditional agency principles." *Id.* The second and third limitations are related because one reason not to extend cat's paw liability to the acts of co-workers is that such acts may often be gratuitous. Supervisors, by contrast, are usually expected to give feedback on their subordinates to decisionmakers as part of their duties.

NYPD officers are certainly not Abdelhadi's supervisors. It is debatable whether they are even, in any realistic sense, his co-workers. It is true, of course, that they are all employees of the City. But the City is not a typical employer; it spends $61 billion a year to provide a wide array of services through more than 300,000 employees in almost 70 different agencies. *See* Working for NYC, http://www.nyc.gov/portal/site/nycgov /menuitem.62e273bb0ef1f307a62fa24601c789a0 (last visited July 19, 2011). Holding the City liable for unsolicited comments made by employees of one agency to decisionmakers in another agency contemplates a scope of liability that the *Staub* Court did not confront.

Moreover, Abdelhadi cannot show that the NYPD officers specifically intended their report to cause his termination. The statements Pasha reported were all made between February 11, 2004, and June 2, 2005—before DOC hired Abdelhadi. The

10

NYPD officers could not have intended Abdelhadi's termination before his employment had even begun.

For these reasons, the Court concludes that Abdelhadi has failed to make a case for cat's paw liability under *Staub*.[6]

## B. Section 1983 Claims

### 1. *First Amendment*

Because DOC terminated Abdelhadi based, in part, on statements he allegedly made, he raises a First Amendment claim. In order to establish such a claim, Abdelhadi must show that "(1) the speech was made as a citizen on matters of public concern rather than as an employee on matters of personal interest; (2) he or she suffered an adverse employment action; and (3) the speech was at least a substantial or motivating factor in the adverse employment action." *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003). If he succeeds, the Court must conduct "*Pickering* balancing," which weighs "the interests of the [employee], as a citizen, in commenting upon matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968). In the interest of efficiency, the Court proceeds directly to this step. *See Blackman v. New York City Transit Auth.*, 491 F.3d 95, 100 n.5 (2d Cir. 2007) ("[I]n cases in which the 'matters of public concern' issue is close but the task of balancing interests does not appear

---

[6]In light of this conclusion, the Court need not decide whether there is sufficient evidence that the NYPD officers acted with discriminatory animus. In that regard, the Court has not relied on the transcripts of conversations during NYPD's investigation. Accordingly, Abdelhadi's letter motion to "file a short letter in reply" to defendants' characterization of those transcripts is denied.

to be a difficult one, it generally will be preferable for a district court to assume *arguendo* that the 'matters of public concern' requirement has been satisfied, and then proceed directly to the balancing of interests.").

It is well-established that "a government official may, in certain circumstances, fire an employee for speaking—even on a matter of public concern—where that speech has the potential to disrupt the work environment." *Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir. 1996). Courts are particularly sensitive to the possibility of violence, *see Piscottano v. Murphy*, 511 F.3d 247, 271 (2d Cir. 2007) (potential for prison violence justfied termination of guards with ties to motorcycle gang), and allow employers to take preventive action, *see id.* ("DOC has a legitimate interest in reducing such risks [of prison violence], without having to wait for emergencies."). A "wide degree of deference" to the employer's assessment of potential harm is due as long as it "has conducted an objectively reasonable inquiry into the facts . . . and has arrived at a good faith conclusion as to those facts." *Id.*

There can be no question that a corrections officer who talks of jihad in America, and who sought his position simply to obtain a weapon, might potentially disrupt DOC's operations—perhaps violently so. The NYPD's allegations provided a good-faith basis for that conclusion, and DOC's internal investigation was an objectively reasonable inquiry into the truth of those allegations. Therefore, Abdelhadi's First Amendment claim must fail.

## 2. Fourteenth Amendment

Insofar as it is based on the Equal Protection Clause of the Fourteenth

Amendment, Abdelhadi's § 1983 claim is analyzed under the same standards as his discrimination claims, *see Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010), and, therefore, fails for the same reasons.

That leaves Abdelhadi's claim under the Due Process Clause of the Fourteenth Amendment. To prevail on this claim, he must show (1) that he was deprived of a "cognizable liberty or property interest under state or federal law," and (2) that he was not afforded "the process he was due under the Constitution." *McKithen v. Brown*, 626 F.3d 143, 151 (2d Cir. 2010) (citing *District Att'y's Office v. Osborne*, 129 S. Ct. 2308, 2319 (2009)).

Abdelhadi was not deprived of a cognizable property interest because it is undisputed that he was a probationary employee at the time of his termination. "Under New York law, '[i]t is well settled that a probationary employee, unlike a permanent employee, has no property rights in his position and may be lawfully discharged without a hearing and without any stated specific reason.'" *Finley v. Giaccobbe*, 79 F.3d 1285, 1297-98 (2d Cir. 1996) (quoting *Meyers v. City of New York*, 622 N.Y.S.2d 529, 532 (2d Dep't 1995)).

As for liberty interests, Abdelhadi asserts a "stigma plus" claim. Such a claim allows vindication of plaintiff's cognizable liberty interest in his or her good reputation, but only if the infringement of that interest was accompanied with a more tangible deprivation, such as a loss of government employment. *See Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004) (citing *Board of Regents v. Roth*, 408 U.S. 564 (1972)). Here, Abdelhadi fails at the second step of the due-process inquiry because the Second Circuit has held that an Article 78 proceeding under New York law provides an adequate postdeprivation opportunity for the plaintiff to clear his or her name. *See Hellenic American Neighborhood*

*Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996); *see also Carter v. Ocean Beach*, 693 F. Supp. 2d 203, 214 (E.D.N.Y. 2010) (applying *Hellenic American* to employment termination claim). Because Abdelhadi could have challenged his termination through an Article 78 proceeding, he was not deprived of his right to due process.

### III

Defendants' motion for summary judgment is granted. Abdelhadi's complaint is dismissed in its entirety.

**SO ORDERED.**

s/ Judge Frederic Block
_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
August 3, 2011